CITY OF SAUSALITO, a municipal corporation, Plaintiff–Appellant,

v.

Brian O'NEILL; John Reynolds, Regional Director of the National Park Service, in his official capacity; Nat'l Park Service, an agency of the U.S. Dept. of the Interior; Cay C. Goude, Acting Field Supervisor of the U.S. Fish & Wildlife Service, in her official capacity; Wayne White, Field Supervisor of the U.S. Fish & Wildlife Service, in his official capacity; Marshall P. Jones, Acting Director of the U.S. Fish & Wildlife Service, in his official capacity; U.S. Fish & Wildlife Service, an agency of the U.S. Dept. of the Interior; Rodney McGinnis, Acting Regional Administrator of the National Marine Fisheries Service, in his official capacity; James R. Bybee, Northern Area Environmental Coordinator of the National Marine Fisheries Service, in his official capacity; William Hogarth, Director of National Marine Fisheries Service, in his official capacity; National Marine Fisheries Service, an agency of the U.S. Dept. of the Interior, Defendants–Appellees.

No. 02–16585.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 2003.

Filed Oct. 20, 2004.

Stephan C. Volker, Oakland, CA, for the appellant.

John A. Bryson, Charles M. O'Connor, John L. Smeltzer, United States Department of Justice, Washington, D.C.; Barbara Goodyear, United States Department

of the Interior, Oakland, CA, for the appellees.

Before: CANBY, W. FLETCHER, and TALLMAN, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

The City of Sausalito, California, brings suit to enjoin the National Park Service from implementing its plans for the development and rehabilitation of Fort Baker, a former military base near Sausalito. Sausalito contends that the National Park Service, the National Marine Fisheries Service, and the United States Fish and Wildlife Service have violated numerous environmental and conservation-oriented statutes, including the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347; the Endangered Species Act, 16 U.S.C. §§ 1531–1544; the Coastal Zone Management Act, 16 U.S.C. §§ 1452–1465; the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–712; the Marine Mammal Protection Act, 16 U.S.C. §§ 1371–1421h; the National Park Service Concessions Management Improvement Act, 16 U.S.C. § 5951, *et seq.;* the Omnibus Parks and Public Lands Management Act of 1996, 16 U.S.C. § 17*o*; the National Park Service Organic Act, 16 U.S.C. §§ 1–18f–3; the Act creating the Golden Gate National Recreation Area, 16 U.S.C. § 460bb; and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

The magistrate judge, hearing the case by consent, granted summary judgment for Defendants, holding that Sausalito lacked standing to assert many of its claims, and that the other claims failed on the merits. We hold that Sausalito has standing to assert all of its claims. However, with the exception of its claims under the Coastal Zone Management Act and the Marine Mammal Protection Act, we hold that Sausalito's claims fail on the merits.

## I. Background

Fort Baker ("the Fort" or "the site") is located in Marin County, California, just over the Golden Gate Bridge from San Francisco. The Fort lies in a 335–acre valley just inside the entrance to San Francisco Bay. It is bounded to the south and east by the shore of the Bay. The City of Sausalito is just north of the Fort, also on the shore of the Bay.

Fort Baker was established as an Army post around the turn of the last century. In 1972, when Congress established the Golden Gate National Recreation Area as a unit of the National Park System, Fort Baker was included in the Recreation Area's boundaries, with the expectation that it would be fully incorporated once it was no longer needed by the Army. *See* 16 U.S.C. § 460bb–2. The Army has been transferring portions of the site to the National Park Service ("Park Service") since the mid–1980s. The Base Closure Act, 10 U.S.C. § 2687, mandated that Fort Baker be closed as an Army facility and completely transferred to the Park Service by 2001.

Fort Baker has been described as "one of the most special gems" of the Golden Gate National Recreation Area. It is praised for its serenity, hiking trails, wildlife, water access, and scenic views. Numerous species of wildlife and vegetation live at Fort Baker, including the endangered Mission Blue Butterfly, for which the Fort is one of its few remaining habitats. The site includes 183 acres of tideland, more than a mile of rocky shoreline, and a harbor at Horseshoe Bay that is

protected by a ten-acre breakwater. Because of two dozen historic buildings arranged around the perimeter of a ten-acre "Parade Ground," the Fort is classified as a historic district in the National Register of Historic Places. The Fort is also home to the Bay Area Discovery Museum, a United States Coast Guard Station, and the Presidio Yacht Club.

In 1980, the Park Service drew up a General Management Plan ("GMP") for the Golden Gate National Recreation Area, including a discussion of the possible future uses of Fort Baker. Pursuant to the National Environmental Protection Act, the GMP was accompanied by an environmental impact statement ("EIS"). The GMP approved the use of historic buildings at Fort Baker as a conference center, the removal of a wooden bulkhead to restore a beach, improvements to the landscape, and the construction of additional parking. In anticipation of the complete transfer of Fort Baker to its authority, the Park Service later sought to update the GMP's proposals to account for critical developments that had occurred since 1980, such as the discovery of a federally listed endangered species at the site. The Park Service therefore prepared a new EIS, which is site-specific to Fort Baker.

The Park Service initiated public scoping in 1997, followed by a period of public comments and meetings. In October 1998, the Park Service released its draft EIS. Thereafter, the Park Service conducted another public scoping, took public comments, and held an additional public meeting. After close of the review period in December 1998, the Park Service agreed to hold additional meetings with Sausalito to address its concerns about the draft EIS.

A final EIS ("FEIS") was released in October 1999. The FEIS details four alternatives for developing Fort Baker, and selects one of these as the plan it proposes to implement ("Fort Baker Plan" or "Plan"). In formulating these alternatives and selecting the Fort Baker Plan, the FEIS identifies the needs of the site, the purpose for the action, and the objectives the Park Service seeks to achieve.

The FEIS identifies three major needs to which the proposed action responds. First, the FEIS recognizes a need to "arrest deterioration" of Fort Baker's historic buildings and "allow for occupancy that will provide for their ongoing care." Second, noting that "Fort Baker's natural values are also exceptional," the FEIS recognizes that "[p]rotection and enhancement of the natural resources of the site as it receives greater public use will require a comprehensive strategy to balance these needs." Third, the FEIS notes that "existing facilities and features for visitors' enjoyment for the site are minimal and inadequate" and that "[t]he Bay Area Discovery Museum [ ] requires additional space at Fort Baker for its program...."

Based on these stated needs, the FEIS identifies five purposes of the proposed action. These purposes are to identify: (1) "the program and types of uses that would be accommodated in the historic buildings that would generate adequate revenue for building rehabilitation and preservation"; (2) "improvements to facilitate public uses, including new construction and removal of buildings, landscape treatments, trails, parking circulation, and locations and patterns of use"; (3) "waterfront improvements"; (4) "opportunities for habitat restoration"; and (5) "an approach to the protection, rehabilitation and maintenance of historic and natural resources."

Based on these needs and purposes, the FEIS proposes six objectives designed to "create a framework for considering and evaluating new uses and site improvements." First, the proposed action

should promote the Park Service's mission by providing public programs and opportunities; protecting, restoring, and maintaining historic, cultural, and natural resources; and providing opportunities for education and interpretation to a diverse public constituency. Second, the proposed action should achieve both environmental and financial sustainability. The latter objective means that the proposed action should "[g]enerate a stable source of revenue that contributes to historic, cultural and natural resource preservation and interpretation including overall site and infrastructure costs." Third, the proposed action should retain and complement the site's special qualities by demonstrating a compelling reason for the program's location at Fort Baker, and by providing waterfront access. Fourth, the proposed action should promote public access by providing for park user and program diversity and promoting public access to buildings and programs. Fifth, the proposed action should minimize environmental impacts, including impacts to the site, adjacent communities, other park sites, traffic, and parking. Sixth, the proposed action should retain and complement permanent site tenants and other Golden Gate National Recreation Area sites and programs, including the Bay Area Discovery Museum and the Coast Guard Station.

Under the Fort Baker Plan chosen by the Park Service, a conference and retreat center, with a maximum of 350 guest rooms, will be established near the Parade Ground using both rehabilitated historic structures and new structures. Parking for a maximum of 455 cars will be provided in already disturbed areas. The Bay Area Discovery Museum will be expanded, and its parking facilities relocated and expanded. The Coast Guard is authorized to build a small addition to its existing facility. The Presidio Yacht Club's facilities

and marina will be opened to the public. A wooden bulkhead will be removed, and the beach will be restored. Forty-two acres of natural habitat, including twenty-three acres of existing Mission Blue Butterfly habitat, will be maintained, enhanced, or restored. Hiking trails throughout the site will be rehabilitated. The Plan also outlines various measures to mitigate anticipated adverse environmental impacts. In June 2000, the Park Service issued the Record of Decision, which adopted the Fort Baker Plan, including its mitigation measures, as the proposed action for the site.

Sausalito filed suit challenging the Plan in federal district court. The court granted summary judgment in favor of Defendants. *City of Sausalito v. O'Neill*, 211 F.Supp.2d 1175 (N.D.Cal.2002). The court held that Sausalito lacked standing to assert its claims under the Coastal Zone Management Act, the Marine Mammal Protection Act, the Migratory Bird Treaty Act, the National Park Service Concessions Management Improvement Act, and the Omnibus Parks and Public Lands Management Act of 1996. The court also held that Defendants had not violated the National Environmental Protection Act, the Endangered Species Act, the National Park Service Organic Act, or the Act creating the Golden Gate National Recreation Area. Sausalito timely appealed.

We review the district court's summary judgment order *de novo*. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the court below correctly applied the relevant substantive law. *See id.*

## II. Standing

■ We review a party's standing *de novo. Gospel Missions of Am. v. City of*

*Los Angeles,* 328 F.3d 548, 553 (9th Cir. 2003). The standing inquiry involves both Article III limitations and non-constitutional statutory limitations. *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.,* 219 F.3d 895, 899 (9th Cir. 2000).

### A. Article III Standing

■ To satisfy Article III standing, Sausalito must demonstrate that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

■ The nature of the Article III standing inquiry is not fundamentally changed by the fact that in many of its causes of action Sausalito asserts a "procedural," rather than "substantive," injury. We have recently stated, with respect to "procedural injury," that

> to show a cognizable injury in fact, [a plaintiff] must allege ... that (1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.

*Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 969–70 (9th Cir. 2003). Whether substantive or procedural injury is alleged, a plaintiff must show a "concrete interest" that is threatened by the challenged action. That is, for Article III purposes, we may recognize a "procedural injury" when a procedural requirement has not been met, so long as the plaintiff also asserts a "concrete interest" that is threatened by the failure to comply with that requirement.

■ For example, a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared under the National Environmental Policy Act when the plaintiff also alleges a "concrete" interest—such as an aesthetic or recreational interest—that is threatened by the proposed action. *See Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (aesthetic and recreational harms may amount to concrete injury-in-fact). For purposes of Article III standing, we do not require a plaintiff to demonstrate that a procedurally proper EIS will necessarily protect his or her concrete interest in the park. Under *Citizens for Better Forestry,* a cognizable procedural injury exists for Article III purposes when, because of a failure to honor a statutorily required procedure, it is "reasonably probable that the challenged action will threaten [a plaintiff's] concrete interests." 341 F.3d at 969–70.

■ As a municipality, Sausalito may not simply assert the particularized injuries to the "concrete interests" of its citizens on their behalf. *See Colorado River Indian Tribes v. Town of Parker,* 776 F.2d 846, 848 (9th Cir.1985) ("[Cities] cannot sue as *parens patriae* because their power is derivative and not sovereign."). Rather, as a municipality, Sausalito may sue to protect its own "proprietary interests" that might be "congruent" with those of its citizens. *Id.* The term "proprietary" is somewhat misleading, for a municipality's cognizable interests are not confined to protection of its real and personal property. The "proprietary interests" that a municipality may sue to protect are as varied as a municipality's responsibilities, powers, and assets.

■ We have recognized that a municipality has an interest in, *inter alia,* its ability to enforce land-use and health regulations, *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States,* 921 F.2d 924, 928 (9th Cir.1990), and its powers of revenue collection and taxation, *Colorado River,* 776 F.2d at 848–49. A municipality also has a proprietary interest in protecting its natural resources from harm. *Fireman's Fund Ins. Co. v. City of Lodi,* 302 F.3d 928, 944 (9th Cir. 2002), *amending* 271 F.3d 911 (9th Cir. 2001). We have also found constitutionally sufficient injury to proprietary interests where "land management practices of federal land could affect adjacent [city]-owned land." *Douglas County v. Babbitt,* 48 F.3d 1495, 1501 (9th Cir.1995) (internal quotation marks and citation omitted).

Sausalito has met its burden of establishing concrete "injury in fact" to its proprietary interests. Sausalito's city manager, Dana Whitson, testified by declaration[1] that:

Sausalito expends millions of dollars annually on the maintenance and management of City lands, historic districts, streets, parking lots, sidewalks, marinas, libraries, meeting halls and other public facilities, and on the provision of public services including fire, police, shuttle bus, trash collection, parking and enforcement of land use plans and zoning regulations.

Sausalito and its citizens and employees would be harmed by implementation of the Fort Baker Plan and the 2,700 daily visitors it would unleash in numerous significant respects including, but not limited to: congested streets, parks, parking lots, and sidewalks, increased crime, noise and trash, impaired and impeded use of streets for fire, police and other emergency services and for the City's natural gas shuttle bus service, impaired air quality, particularly along major thoroughfares, lost property and sales tax revenue due to impaired vehicular movement and commerce rendering Sausalito less attractive to business.

The Fort Baker Plan will harm Sausalito's tourism industry because added traffic congestion and crowded streets will destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes. The City's tourism industry and dependent property and sales tax revenues would also suffer because the City's marina, parks, trails and shoreline would be less attractive and ecologically healthy....

\* \* \*

A large proportion of tourist "traffic" into Sausalito arrives by ferry or bus. Due to its isolated location, hotel guests at the proposed Fort Baker conference center will access Sausalito by car and thereby increase vehicular congestion in the City's quiet streets.

The district court found that Whitson's declaration sufficiently demonstrates Article III injury, stating that the "Fort Baker Plan would result in a detrimental increase in traffic and crowds in downtown Sausalito, affecting City-owned streets as well as municipal management and public safety functions." *City of Sausalito,* 211

---

1. Sausalito challenges the district court's ruling striking portions of Whitson's declaration about which the magistrate held Whitson was not competent to testify. *City of Sausalito v. O'Neill,* 211 F.Supp.2d 1175, 1186 n. 1 (N.D.Cal.2002). We hold that the court did not abuse its discretion in striking portions of Whitson's declaration, and we quote Whitson's declaration here as modified. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion).

F.Supp.2d at 1186. We agree. We add that Sausalito also asserts injury to its aesthetic appeal in that the congestion accompanying the Plan "will destroy the City's quiet, beauty, serenity and quaint and historic village character and attributes." This injury is cognizable as both an aesthetic injury and—because the City alleges that the aesthetic damage will erode its tax revenue—as an economic injury. *See Friends of the Earth,* 528 U.S. at 183, 120 S.Ct. 693. Finally, the declaration asserts injury to Sausalito's natural resources, citing an increase in "noise and trash," "impaired air quality," and harm to its "marina, parks, trails and shoreline." We hold that each of the management, public safety, economic, aesthetic, and natural resource harms constitutes injury to Sausalito's "proprietary" interests as a municipal entity.

■ Applying the three *Friends of the Earth* factors, we hold that Sausalito has adequately claimed injury for Article III purposes. First, Sausalito has alleged harm to its proprietary interests with sufficient detail to state a "concrete and particularized" injury. *Id.* at 180, 120 S.Ct. 693. Second, the injuries are "actual or imminent, not conjectural or hypothetical[,]" and are "fairly traceable" to the implementation of the Fort Baker Plan. *Id.* The FEIS itself acknowledges that implementation of the Plan will result in an increase in local traffic, an increase in air pollutant emissions, and an incremental contribution to the cumulative noise environment. The FEIS thus finds that implementation of the Fort Baker Plan will result in known, predictable consequences that Sausalito identifies as concrete injury. Third, because Sausalito's asserted injuries will not occur if the Plan is not implemented, Sausalito has alleged injury that can be redressed by a decision blocking implementation of the Plan. *Id.* at 180–81, 120

S.Ct. 693. To put it in the terms we used in *Citizens for Better Forestry,* if the Plan is not implemented, the "reasonably probable" threat to Sausalito's concrete proprietary interests will have been removed. 341 F.3d at 969.

### B. Non-constitutional Standing

■■ It is not enough, however, for a plaintiff to satisfy the constitutional standing requirements of Article III. A plaintiff must also satisfy the non-constitutional standing requirements of the statute under which he or she seeks to bring suit. This non-constitutional standing inquiry is not whether there is a "case or controversy" under Article III, and thus does not go to our subject matter jurisdiction. Rather, the nonconstitutional standing inquiry is whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit. Once the Article III standing requirement is satisfied, this is a purely statutory inquiry.

■ Some statutes grant standing narrowly. Under such statutes, some would-be plaintiffs with obvious, real-world interests in the outcome of a suit are nevertheless unable to sue because the statute has not conferred standing upon them. *See, e.g., United Dairymen of Arizona v. Veneman,* 279 F.3d 1160, 1165 (9th Cir. 2002) (under *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 352, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), milk consumers have no standing to challenge milk market order under the Agricultural Marketing Agreement Act, even though the effect of the order is to increase retail milk prices). Other statutes grant standing very broadly, some as broadly as Article III permits. Under such statutes, would-be plaintiffs with small or minimal real-world interests are able to sue. *See, e.g., Friends of the Earth,* 528 U.S. at 180–89, 120 S.Ct. 693 (upholding standing for plaintiff suing un-

der citizen-suit provision of the Clean Water Act).

Statutes, however, rarely spell out in specific terms who does and does not have standing to sue. In difficult or uncertain cases, courts are left to infer the answer from various sources, including the purpose of the statute and background assumptions drawn from the common law. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U.L. REV. 881, 886 (1983). But the fundamental inquiry is straightforward, even if the answer is not always obvious: Does the statute in question confer a right to sue on the plaintiff who seeks to bring suit?

If statutory standing is not explicitly provided in the text of a statute, a plaintiff challenging federal administrative action looks to Section 10(a) of the Administrative Procedure Act ("APA"), which provides that any "person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA, a " 'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2).

Interpreting the APA, the Supreme Court in *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), held that anyone "arguably within the zone of interests" protected by the statute under which he or she has asserted injury has standing to bring suit under that statute. The Court has instructed that the "zone of interests" test is to be construed generously, stating that the "test is not meant to be especially demanding," and that a court should deny standing under the "zone of interest" test only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *see also Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1059 (9th Cir.2004); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1120–21 (9th Cir.2004). Specifically, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1004 (9th Cir.1998) (citing *Clarke*, 479 U.S. at 399–400, 107 S.Ct. 750).

 As a municipal corporation, Sausalito qualifies as a "person" under Section 10(a) of the APA. To determine whether Sausalito is within the zone of interests of the statutes under which it brings suit, we look "to the substantive provisions of the [statutes], the alleged violations of which serve as the gravamen of the complaint." *Bennett v. Spear*, 520 U.S. 154, 175, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). We are instructed by *Clarke* to understand these substantive provisions liberally. Thus, "APA plaintiffs need only show that their interests fall within the 'general policy' of the underlying statute, such that interpretations of the statute's provisions or scope could directly affect them." *Graham*, 149 F.3d at 1004 (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank and Trust Co.*, 522 U.S. 479, 487–88, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (further citations omitted)).

Defendants have objected to statutory standing for five of the statutes under which Sausalito seeks to bring suit. Those statutes are the Coastal Zone Management Act, the Marine Mammal Protection Act, the Migratory Bird Treaty Act, the Concessions Management Improvement Act, and the 1996 Omnibus Parks and Public Lands Management Act. We address these

statutes in turn, and conclude that Sausalito has standing under each of them.

### 1. Coastal Zone Management Act

The purpose of the Coastal Zone Management Act ("CZMA") is to "preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone for this and succeeding generations." 16 U.S.C. § 1452(1). To accomplish these ends, the CZMA encourages the states to draw up "management plans" for their coastal zones and requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." *Id.* § 1456(c)(1)(A). A federal agency ensures consistency of its proposed actions with state management programs by submitting a "consistency determination to the relevant State agency." *Id.* § 1456(c)(1)(C); *see also* 15 C.F.R. § 930.36. After receipt of the consistency determination, the "State agency shall inform the Federal agency of its concurrence with or objection to the Federal agency's consistency determination." 15 C.F.R. § 930.41. Sausalito contends that the Park Service violated the CZMA because the Fort Baker Plan is not "consistent to the maximum extent practicable" with the approved state management program for the San Francisco Bay. 16 U.S.C. § 1456(c)(1)(A).

■ The district court denied standing under the CZMA, holding that the CZMA's "zone of interests" extends only to "a state's protection of their [sic] coastal zones, but not to a local entity's quarrel with the state agency's conclusion...." *City of Sausalito*, 211 F.Supp.2d at 1187. We disagree. It is true that local governments like the City of Sausalito are not charged with making or concurring in consistency determinations under the CZMA. But this does not mean that they do not have standing to challenge determinations made by others. If the only parties that could challenge a consistency determination were the agencies that had already made or concurred in that determination, there would effectively be no judicial review of CZMA compliance. There is no indication that the CZMA was intended by Congress to insulate from judicial review the actions of the agencies required to comply with the statute. We have, in the past, allowed parties other than those charged with making or concurring in a consistency determination to bring suit under the CZMA. *See, e.g., Akiak Native Cmty. v. U.S. Postal Serv.,* 213 F.3d 1140, 1144–46 (9th Cir.2000) (reviewing CZMA claims brought by Alaska Native communities); *Northwest Envtl. Def. Ctr. v. Brennen,* 958 F.2d 930, 936–37 (9th Cir.1992) (reviewing CZMA claims brought by environmental organizations).

■ We hold that adversely affected local governments are within the "zone of interests" of the CZMA, as parties "adversely affected or aggrieved" by an improper consistency determination, and that Sausalito therefore has standing. 5 U.S.C. § 702; *see Clarke,* 479 U.S. at 399, 107 S.Ct. 750. The CZMA explicitly states that it is "national policy" to "encourage the participation and cooperation of the public, state and *local governments* ... in carrying out the purposes of [the statute]." 16 U.S.C. § 1452(4) (emphasis added); *see also id.* § 1452(5) (It is "national policy" to "encourage coordination and cooperation with and among the appropriate Federal, State, and *local agencies* ....") (emphasis added). Further, we have previously indicated in dictum our view that local governments have standing

to sue under the CZMA. In *California v. Watt*, 683 F.2d 1253 (9th Cir.1982), *rev'd on other grounds sub nom., Sec'y of the Interior v. California*, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984), we analyzed whether certain environmental groups had standing under the CZMA. We observed, "The CZMA issues the environmental groups sought to raise were identical to those raised by the State of California and the *local governments, parties who clearly had standing.*" *Id.* at 1271 (emphasis added). In *Watt*, we thus assumed without discussion that local governments could bring suit under the CZMA. As a local government that has asserted injury to the ecological health and attractiveness of its marina and shoreline, and consequent injury to its "proprietary interests," Sausalito has adequately asserted that it comes within the "zone of interests" of the CZMA. *See also City and County of San Francisco v. United States*, 443 F.Supp. 1116, 1128 (N.D.Cal.1977) (San Francisco had standing under CZMA because "alleged injury affect[ed] the City's interest in protecting the environmental integrity of those portions of the San Francisco Bay under its control and insuring the most effective use and management of this resource.").

### 2. Marine Mammal Protection Act

 The Marine Mammal Protection Act ("MMPA") prohibits "taking" a marine mammal without a permit. 16 U.S.C. §§ 1372, 1374. The statute defines "taking" as harassing, hunting, capturing, or killing a marine mammal, as well as attempting to do so. *Id.* § 1362(13), (18); 50 C.F.R. § 216.3. Sausalito contends that implementation of the Fort Baker Plan will cause the "taking" of sea lions and harbor seals under the MMPA, and that a permit is therefore required. The FEIS makes clear that the Park Service has not ap-

plied, and does not intend to apply, for a permit.

Sausalito argues that it is explicitly granted standing under Section 104(d)(6) of the MMPA, which provides: "Any applicant for a permit, or any party opposed to such permit, may obtain judicial review of the terms and conditions of any permit issued by the Secretary under this section or of his refusal to issue such a permit." 16 U.S.C. § 1374(d)(6). We held in *Jones v. Gordon*, 792 F.2d 821, 824–25 (9th Cir. 1986), that Section 104(d)(6) provides for judicial review of permits already issued and of the Secretary's refusal to issue permits. However, Sausalito challenges neither the substantive terms of an already issued permit nor the refusal to issue a permit. Rather, it challenges the Park Service's refusal to seek a permit at all. Sausalito's challenge therefore does not come within the explicit grant of standing under Section 104(d)(6).

Nonetheless, if Sausalito comes within the "zone of interests" of the MMPA, it has standing to seek an injunction requiring that a permit be obtained, or, in the absence of a permit, forbidding an activity that constitutes a "taking" of a marine mammal. The MMPA is intended to protect marine mammals so that they continue "to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). According to the MMPA:

[M]arine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of the Congress that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management and that the primary objective of their management should be to maintain the health and stability of the

marine ecosystem. Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat.

*Id.* § 1361(6). Marine mammal conservation is thus the goal of the MMPA, and the statute explicitly recognizes that such conservation is a worthy objective because of "esthetic and recreational as well as economic" concerns.

Implementation of the MMPA would be severely hampered if affected parties with conservationist, aesthetic, recreational, or economic interests in marine mammal protection were not allowed to bring suits challenging failures to apply for required permits. We believe that under the most reasonable interpretation of the "zone of interests" test, as liberally construed by the Court in *Clarke*, standing is granted to any party who would be "adversely affected or aggrieved" by the failure of a party to procure a permit that is required under the MMPA. 5 U.S.C. § 702; *see Clarke*, 479 U.S. at 399, 107 S.Ct. 750.

The FEIS for the Fort Baker Plan states that construction and increased use of the waterfront area of Fort Baker will result in marine mammals making "less frequent use of the area." Because Sausalito has asserted aesthetic, recreational, and economic interests tied to the presence of marine mammals in the water and along its shoreline, it is "adversely affected or aggrieved" by the failure of the Park Service to seek an MMPA permit. 5 U.S.C. § 702; *see Clarke*, 479 U.S. at 399, 107 S.Ct. 750. We therefore hold that Sausalito has standing to sue to require the Park Service to apply for an MMPA permit before implementing the Fort Baker Plan.

### 3. Migratory Bird Treaty Act

The Migratory Bird Treaty Act ("MBTA") protects migratory birds. Its stated purpose is "to aid in the restoration of such birds in those parts of the United States adapted thereto where the same have become scarce or extinct, and also to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed." 16 U.S.C. § 701. The MBTA specifically forbids pursuing, hunting, taking, capturing, killing, or attempting to take, capture or kill migratory birds without authorization from the Secretary of the Interior. *Id.* §§ 703, 704; 50 C.F.R. § 21.27. Sausalito contends that implementation of the Fort Baker Plan—specifically, construction activities, tree removal, and increased visitor usage—"may result in the foreseeable deaths of migratory birds" and may thereby violate the MBTA. It is clear from the FEIS that the Park Service has not sought, and does not intend to seek, authorization from the Secretary.

On its face, the MBTA is a criminal statute. *See id.* §§ 706, 707(a)-(d). The statute does not specifically authorize civil injunctive suits, and it says nothing about who has standing to bring such a suit. However, this court, the D.C. Circuit, and the Eighth Circuit have decided civil injunctive suits brought under the MBTA by animal welfare or environmental organizations. *See Seattle Audubon Soc'y v. Evans*, 952 F.2d 297, 302–03 (9th Cir.1991); *Humane Soc'y of the U.S. v. Glickman*, 217 F.3d 882, 888 (D.C.Cir.2000); *Newton County Wildlife Ass'n v. U.S. Forest Serv.*, 113 F.3d 110, 114–15 (8th Cir.1997). Although the necessary implication of these decisions is that a civil injunctive suit is authorized under the MBTA, and that the plaintiff organizations had standing to bring the suits, neither question was discussed in the opinions.

We are bound to follow the implicit, but necessary, holding of our decision in *Se-*

*attle Audubon Society.* We therefore hold that anyone who is "adversely affected or aggrieved" by an agency action alleged to have violated the MBTA has standing to seek judicial review of that action. 5 U.S.C. § 702; *see Clarke,* 479 U.S. at 399, 107 S.Ct. 750. Because Sausalito asserts an interest in its ecological health and aesthetic appeal, a component of which is the presence of migratory birds, we hold that Sausalito has standing to challenge the Park Service's proposed action under the MBTA.

### 4. Concessions Management Improvement Act

■ The National Park Service Concessions Management Improvement Act, 16 U.S.C. § 5951 *et seq.* ("CMIA"), governs the award and administration of these concession contracts and "establish[es] a ... comprehensive concession management program for national parks." *Nat'l Park Hospitality Ass'n v. Dep't of the Interior,* 538 U.S. 803, 806, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). "To make visits to national parks more enjoyable for the public, Congress authorized [the Park Service] to grant privileges, leases, and permits for the use of land for the accommodation of visitors. Such privileges, leases, and permits have become embodied in national parks concession contracts." *Id.* at 805–06, 123 S.Ct. 2026 (internal quotations and citation omitted).

> In enacting the CMIA, Congress found: that the preservation and conservation of park resources and values requires that such public accommodations, facilities, and services as have to be provided within such units should be provided only under carefully controlled safeguards against unregulated and indiscriminate use, so that—
>
> (1) visitation will not unduly impair these resources and values; and

> (2) development of public accommodations, facilities, and services within such units can best be limited to locations that are consistent to the highest practicable degree with the preservation and conservation of the resources and values of such units.

16 U.S.C. § 5951(a). Further, Congress declared that it is congressional policy:

> that the development of public accommodations, facilities, and services in units of the National Park System shall be limited to those accommodations, facilities, and services that—
>
> (1) are necessary and appropriate for public use and enjoyment of the unit of the National Park System in which they are located; and
>
> (2) are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the unit.

*Id.* § 5951(b).

Sausalito contends that the conference center proposed for Fort Baker will bring development and commercialization that will impair Fort Baker's natural resources and harm Sausalito through increased congestion. We do not require that Sausalito be a potential concessioner to have standing under the CMIA. It is sufficient that Sausalito assert injury to its "proprietary interest" that would result if the public accommodations, facilities, and services are constructed or provided in a manner Sausalito contends is inconsistent with the CMIA. *Cf. Wilderness Pub. Rights Fund v. Kleppe,* 608 F.2d 1250 (9th Cir.1979) (resolving on the merits a suit by nonconcessioner plaintiff brought under the federal statute superceded by the CMIA, Concessions Policy Act, formerly at 16 U.S.C. §§ 20–20g). As a party "adversely affected or aggrieved" by a concession that potentially violates the congressional poli-

cies underlying the CMIA, Sausalito is within the statute's "zone of interests." 5 U.S.C. § 702; *see Clarke*, 479 U.S. at 399, 107 S.Ct. 750; *cf. Glacier Park Found. v. Watt*, 663 F.2d 882, 885 (9th Cir.1981) (plaintiff has standing under Concessions Policy Act because, *inter alia*, "its esthetic interests in preservation of the historical nature of Glacier Park are within the zone of interests protected by the statute.").

The Park Service contends that Sausalito is not within the CMIA's zone of interests because the CMIA does not regulate "the type of long-term lease for the retreat and conference center envisioned in the Fort Baker plan," but this contention is unavailing. The regulations implementing the CMIA define a "concession contract" as a "binding written agreement between the Director and a concessioner entered under the authority of this part ... that authorizes the concessioner to provide certain visitor services within a park area under specified terms and conditions." 36 C.F.R. § 51.3. The FEIS states that "[t]he conference and retreat center operator would be selected under existing [Park Service] authorities that provide for long-term agreements for rehabilitation and operation of park buildings." The Park Service offers nothing to support its contention that the operation of the conference center, as described in the FEIS, does not qualify as a concession governed by the CMIA.

### 5. Omnibus Parks and Public Lands Management Act of 1996

 Under the Omnibus Parks and Public Lands Management Act of 1996 ("Omnibus Act"), the Secretary of the Interior "is authorized where necessary and justified to make available employee housing, on or off the lands under the administrative jurisdiction of the [Park Service], and to rent or lease such housing to field employees of the [Park Service]...." 16 U.S.C. § 17o(2). Such authorization is intended, *inter alia*, to help "eliminate unnecessary Government housing and [to] locate such housing as is required in a manner such that primary resource values are not impaired." *Id.* § 17o(1)(E). The Omnibus Act directs that "[t]he Secretary may not utilize any lands for the purposes of providing field employee housing under this section which will impact primary resource values of the area or adversely affect the mission of the agency." *Id.* § 17o(17)(A).

Sausalito contends that the Fort Baker Plan violates section 17o(17)(A) of the Omnibus Act because the on-site housing of concession employees at the conference center will impair Fort Baker's "primary resource values" of "scenic beauty and natural character." Sausalito has asserted injury based on increased congestion and traffic caused, *inter alia*, by on-site employees' trips into Sausalito. As "a party adversely affected or aggrieved" by on-site housing that potentially violates the policies Congress sought to further through the Omnibus Act, Sausalito is within the statute's "zone of interests."

### III. Statutory Duties

We have thus held, or Defendants have conceded, that Sausalito has standing to sue under all the statutes it seeks to enforce. We now turn to the question of whether Defendants have violated, or will violate, the duties proscribed by those statutes.

### A. Standard of Review

 Because the statutes under which Sausalito seeks to challenge administrative action do not contain separate provisions for judicial review, our review is governed by the APA. *See, e.g., Morongo Band of Mission Indians v. FAA*, 161 F.3d 569,

573 (9th Cir.1998) (review under the National Environmental Protection Act); *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1235–36 (9th Cir.2001) (review under the Endangered Species Act); *Akiak*, 213 F.3d at 1144 (review under the CZMA); *Hill v. Norton*, 275 F.3d 98, 103 (D.C.Cir.2001) (review under the MBTA); *Ocean Advocates*, 361 F.3d at 1118 (review under the MMPA). We will reverse agency action only if it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 471 (9th Cir.2000). An agency's action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

■■■ *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). While we must be "searching and careful" in our inquiry, *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (internal quotations and citations omitted), we may not substitute our own judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). We "must uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *Selkirk Conservation Alliance v.*

*Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003) (quoting *Washington Crab Prods., Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir.1990) (further internal citations omitted)).

■■■ Where "a court reviews an agency action involv[ing] primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Sierra Club v. U.S. EPA*, 346 F.3d 955, 961 (9th Cir.2003), *amended by* 352 F.3d 1186 (9th Cir.2003) (internal quotations and citation omitted); *see also Ariz. Cattle*, 273 F.3d at 1236 ("We are deferential to the agency's expertise in situations ... where 'resolution of the dispute involves primarily issues of fact.'") (quoting *Marsh*, 490 U.S. at 377–78, 109 S.Ct. 1851); *Selkirk*, 336 F.3d at 954 ("Disputes involving 'primarily issues of fact' must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors.") (quoting *Marsh*, 490 U.S. at 377–78, 109 S.Ct. 1851).

**B. National Environmental Policy Act**

The National Environmental Policy Act ("NEPA") requires that an environmental impact statement be prepared for "major Federal actions significantly affecting the quality of the human environment...." 42 U.S.C. § 4332(2)(C). The EIS should "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

■■■ Our review of an EIS is limited to a "rule of reason that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the

probable environmental consequences." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992) (internal citations and quotations omitted). The key question is whether the EIS's "form, content and preparation foster both informed decisionmaking and informal public participation." *Id.* (internal citations and quotations omitted). If we are "satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end." *Id.* (internal citations and quotations omitted).

Sausalito challenges the FEIS for the Fort Baker Plan in several respects. First, Sausalito contends that the FEIS fails to consider reasonable alternatives to the Plan. Second, it contends that the FEIS fails to consider the impacts of the Plan on traffic. Third, it contends that the FEIS fails to consider the "commercialization precedent" that implementation of the Plan will allegedly create. Fourth, it contends that the FEIS does not adequately discuss the effects of the Plan on wildlife. Fifth, it contends that the FEIS "fails to support its conclusion with scientific evidence." Finally, it contends that the FEIS does not sufficiently disclose and discuss the cost-benefit analyses that the Park Service may have performed. We address these contentions in turn. We conclude, as to all of them, that the Park Service has taken the requisite "hard look."

### 1. Alternatives

■■■■ NEPA provides that federal agencies must, to the fullest extent possible, "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The alternatives section is "the heart of the environmental

impact statement." 40 C.F.R. § 1502.14. The EIS, however, "need not consider an infinite range of alternatives, only reasonable or feasible ones." *City of Carmel–by–the–Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1997); 40 C.F.R. § 1502.14(a)-(c). The rule of reason "guides both the choice of alternatives as well as the extent to which the[EIS] must discuss each alternative." *Carmel*, 123 F.3d at 1155. " '[F]or alternatives which were eliminated from detailed study, [the EIS must] *briefly discuss* the reasons for their having been eliminated.' " *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir.2000) (quoting 40 C.F.R. § 1502.14(a) (emphasis added by the court)).

■■■ The FEIS identifies and considers in detail four alternatives: (1) the Fort Baker Plan; (2) the "GMP Alternative"; (3) the "Office and Cultural Center Alternative"; and (4) "the No–Action Alternative." During scoping and initial planning, the Park Service considered other alternatives that were "initially thought to be viable or were suggested by the public," but were not developed in further detail "because they were determined to be infeasible or did not fit within the Purpose and Need for the project." The Park Service initially considered, but then rejected, a "maximum natural resource restoration" alternative. Other rejected alternatives discussed in the FEIS include use of the site as a charter or independent school, as a university campus, as a lodging facility, as an arts and education center, as a residential youth academy of environmental science and art, and as a fully operating military post.

Sausalito contends that the Park Service should have identified and analyzed in detail more than the four alternatives considered in the FEIS. Specifically, Sausalito contends that the FEIS should have evaluated in more detail alternatives that would

have maximized natural resource restoration and that would have developed "noncommercial," "low-impact," or "non-urbanized" uses for the site. Sausalito's strongest argument is that the Park Service should have explored the possibility of congressional funding for the refurbishment of Fort Baker so that revenue generation at the site would not be needed. Sausalito contends that if congressional funding had been obtained, the conference center would not have been an essential part of the Plan, and the alternatives Sausalito favors would have been feasible.

As an initial matter, the Park Service contends that because Sausalito did not raise its concern about funding during public comments and in its many exchanges with the Park Service, it has not satisfied our requirement that those who challenge an EIS "bear a responsibility to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position and contentions." *City of Angoon v. Hodel,* 803 F.2d 1016, 1022 (9th Cir.1986) (internal quotation and citation omitted); *cf. Morongo Band,* 161 F.3d at 576 (implying that "the burden is on the party challenging the agency action to offer feasible alternatives."). A party has participated in a sufficiently meaningful way when it has alerted the agency to its position and claims. *See Angoon,* 803 F.2d at 1022. Sausalito adequately made its concerns about funding at Fort Baker known to the Park Service throughout the public review and comment process. For example, in April 1999, Sausalito's mayor wrote to Golden Gate National Recreation Area Superintendent Brian O'Neill: "[W]e cannot stress enough the desire of our City to have this project reduced to an appropriate scale.... *To this end, we urge the Park Service to seek new funding, if necessary, to supplement the cost of rehabilitation in order to reduce the scope of the project.*" (Emphasis added.) Similarly, in

December 1999, Sausalito's mayor wrote to Regional Park Service Director John Reynolds expressing concern that while

the reason the preferred alternative was selected was that it provides the economic wherewithal to support the needed improvements to historic buildings[,] [n]o other alternative for preservation of the buildings and/or reducing the costs of that effort was considered. Other possibilities include seeking multiple philanthropic entities to each sponsor one historic building for renovation and maintenance with selected options as to the building's use. Such an alternative would minimize the size of, if not eliminate the need for, the retreat center.

The Park Service was thus clearly alerted to Sausalito's concerns that the Park Service's pursuit of funding had been too limited.

In the past we have cautioned that "even if an alternative requires 'legislative action[,]' this fact 'does not automatically justify excluding it from an EIS.'" *Methow Valley Citizens Council v. Reg. Forester,* 833 F.2d 810, 815 (9th Cir.1987), *overruled on other grounds by Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (quoting *City of Angoon,* 803 F.2d at 1021); *see also Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir.1984) ("In some cases an alternative may be reasonable, and therefore required by NEPA to be discussed in the EIS, even though it requires legislative action to put it into effect."). However, we have also noted that"[i]f an alternative requires congressional action, it will qualify for inclusion in an EIS only in very rare circumstances." *City of Angoon,* 803 F.2d at 1022 n. 2. We identified one of these "very rare" circumstances in *Muckleshoot Indian Tribe v. United States Forest Service,* 177 F.3d 800 (9th Cir.1999). There we held that an EIS prepared by the Forest

Service should have considered the alternative of requesting funds from the Federal Land and Water Conservation Fund, even though such funds might not have been available. *See id.* at 814. We noted that the alternative actually selected by the Forest Service in the EIS explicitly and frequently relied upon other "admittedly speculative funds" for financing, and we were "troubled by this selective willingness to rely upon the availability of funding sources beyond the Forest Service's direct control." *Id.* In this circumstance, we concluded that it would have been reasonable to consider seeking federal funds as an alternative.

In assessing whether we confront another of those "very rare circumstances" here, we must understand the context in which the Park Service dealt with funding limitations. It is clear from the record that the lack of congressional funding available for rehabilitation of the historic structures at Fort Baker was a central concern of the Park Service throughout the development of the Fort Baker Plan. It is also clear from the administrative record that the lack of congressional funding was not merely "speculative."

Acting Park Service Superintendent B.J. Griffith explained the Park Service's efforts at procuring congressional funds to Sausalito's mayor in April 1999:

> During the planning effort for Fort Baker, we have pursued various funding sources to address this preservation challenge and ensure a smooth transition from military post to national park. We have presented our needs through Park Service budgeting channels, to relevant congressional committees, and to the Army in light of their responsibilities for current building maintenance and environmental clean-up. We have hosted the entire Congressional Subcommittee on Interior Appropriations at

the site. We have discussed the project with the philanthropic community.

> *While each of these groups is supportive of the conversion from military post to national park, and will contribute in some way to its realization, the majority of the preservation funds must come through the re-use concept itself.* In our minds, the retreat and conference facility is the best avenue to achieve our primary goals: preservation of the site and public access.

(Emphasis added.) Griffith reiterated these points one month later, stating, "With regard to funding opportunities for long-term rehabilitation and maintenance of the buildings at Fort Baker, Congress has made it clear that new uses will need to provide funds for this purpose."

The Park Service's assessment of the limitations of congressional funding was discussed openly throughout the planning process. After scoping had closed in October 1997, Chief Park Service Planner for Fort Baker Nancy Hornor briefed a citizens' advisory committee. She stated, "Financial sustainability was one of the important criteria for the site, [b]ecause we are not really anticipating that we are going to get a big influx of federal dollars to pay for the high cost of rehabilitating both the buildings and the infrastructure on the site." In September 1998, before the same citizens' group, Park Service Project Manager Ron Golem identified "the need for outside funding" as one of the "guiding principles for the implementation of this plan." He explained:

> Particularly when we talk about building rehabilitation. We are going to be looking to the lessee of the conference and retreat center to really bring in the financing that is going to accomplish the rehabilitation of the historic resources. We are going to be looking to private philanthropy to hopefully contribute to-

wards the open space and site improvements....

*And really what we are going to be looking for Congress to do—and this is the feedback that we have gotten from them that this is how we should be doing it—is that there is a set of costs that we really can't expect anybody else to take care of. And those are the costs that relate to the infrastructure, the basic utility systems, the roads.*

(Emphasis added.)

The record also reflects the Park Service's consistent attempts to work with members of Congress to secure whatever funding was available. Park Service memoranda indicate that as of March 1999, Congressman Jack Murtha was continuing his efforts "to secure military funding of the $12.5 million infrastructure requirement" and that various members of Congress, including members of the Military Construction Committee and the National Security Appropriations Subcommittee, had been "engaged" with respect to seeking funding. In July 1999, Congressman Ralph Regula, Chair of the Subcommittee on Interior and Related Agencies of the House Appropriations Committee, wrote to Superintendent O'Neill thanking him for "the briefings and information you provided to the subcommittee members regarding issues of importance to the park[.]" Regula specified that "[t]he subcommittee members seemed very excited about the potential for Fort Baker and we were, of course, please[d] to hear that Jack Murtha would pursue the $12 million needed for infrastructure repairs in the Defense bill." However, Regula cautioned, "As you know, our Interior bill allocation fell $200 million below the enacted level and we are limiting new projects so that we can make a serious dent in backlog maintenance needs of the parks." In 1999, the Park Service succeeded in procuring some funds from Congress when the Department of Defense's Appropriations Bill contained five million dollars for infrastructure repair at Fort Baker. In 2000, the House Appropriations Committee approved another six million dollars for infrastructure improvements at Fort Baker.

The record thus indicates that Park Service planners kept abreast of possible congressional funding sources, were well-informed as to the limitations of these sources, and were, on occasion, successful in obtaining funding. That the Park Service's efforts were focused on appropriations that covered infrastructural improvements, and not on appropriations that would have indefinitely sustained the site, does not indicate that the Park Service did not diligently pursue congressional funding. On the contrary, as is made clear from Griffin's and Golem's comments, as well as other information in the record, the Park Service's focus resulted from an informed understanding of Congress's willingness to fund Fort Baker's rehabilitation and a strategic choice about how best to secure whatever funding might be available. It was thus reasonable for the FEIS not to have explored in detail the "alternative" of additional congressional funding beyond what the Park Service had already secured. Sausalito may wish that Congress had been more receptive to the Park Service's requests or that the Park Service could have devised a different and more effective strategy in seeking congressional funding. But this desire alone does not require us to conclude that the FEIS is inadequate. We therefore do not confront one of those "very rare circumstances" where an EIS is inadequate for not including the "alternative" of seeking federal funds.

### 2. Traffic Impact

The FEIS states, "During scoping, the most frequently voiced concerns

were the potential impacts on traffic and parking demand resulting from new building uses and site improvements." In response, as the district court noted, the FEIS contains a detailed, fifteen-page analysis of traffic concerns describing the methods used to study traffic, and the Plan's impact on parking and traffic. Further, the Fort Baker Plan specifically provides for ongoing traffic monitoring and a "Traffic Management Plan" to set "specifications on construction traffic scheduling, proposed haul routes, construction parking, staging area management, visitor safety, detour routes, and speed controls (including those addressed in [the section discussing] the [endangered] mission blue butterfly)." Finally, the FEIS contemplates a "Transportation Demand Management Program" to address traffic and parking concerns, including providing a shuttle service and alternative modes of transportation to Fort Baker. These detailed discussions satisfy us that the Park Service took a "hard look" at the Plan's traffic impacts and "foster[ed] informed decisionmaking and informed public participation" on this issue. *Mumma*, 956 F.2d at 1519 (citation omitted).

### 3. Commercialization Precedent

 The Council on Environmental Quality Guidelines ("Guidelines"), the regulations implementing NEPA, require that an EIS discuss "[t]he degree to which the action may establish a precedent for future actions." 40 C.F.R. § 1508.27(b)(6). The FEIS discusses in depth any "commercialization precedent" that would result from implementation of the Fort Baker Plan. It analyzes the Plan's impact on regional community services and employment opportunities, including local hotels and expected visitor spending in the region. The Plan also discusses its consistency with relevant land-use plans, such as the Presidio General Management Plan, the San

Francisco Bay Plan, the Marin County-wide Plan, and the Sausalito General Plan, each of which discusses the uses of land within its relevant boundaries. Finally, and critically, in its discussion of the "Growth–Inducing Impacts" of the Fort Baker Plan, the FEIS states:

> New employee households would create increased demands for goods and services in areas surrounding their homes and throughout the Bay Area.

> Increased visitation at Fort Baker would increase the demand for lodging, restaurant, and other tourist-oriented services in surrounding areas, especially in Sausalito, Tiburon and San Francisco. This business growth, combined with other park improvements, would potentially increase demand for local hotels . . . .

> Infrastructure improvements would not encourage additional growth outside of Fort Baker because these improvements are only for onsite services.

> Planned traffic circulation and safety improvements would not increase the capacity of affected transportation networks beyond that needed to accommodate Fort Baker traffic and transit services. Therefore, additional indirect population and housing growth in other areas served by the same traffic network is not expected.

These discussions satisfy the Guidelines' direction to consider "the degree to which the action may establish a precedent for future actions with significant effects." 40 C.F.R. § 1508.27(b)(6). By providing information about the likely community and commercial impacts of the Plan on the regional economy, as well as placing these impacts in the context of regional land-use plans, the Park Service has taken the requisite "hard look" at this issue and provides the information necessary to make

an "informed decision" about the "commercialization precedent" that may be established by the Fort Baker Plan. *Mumma,* 956 F.2d at 1519.

### 4. Impact on Wildlife

The FEIS discloses that "[c]onstruction activities at the fishing pier and marina could temporarily disrupt marine animals, including harbor seals, California sea lions, and feeding, resting and nesting waterbirds and seabirds, in the proximity of work sites and in the water. However, there would be no long-term adverse impact on marine species due to construction activities in these areas." The FEIS also states that "[i]ncreased recreational boating in the area and use of the boat ramp might disrupt marine mammals, and wintering water birds that congregate in the area." As mitigation, the FEIS provides that "[d]esignation of appropriate recreational uses, interpretive signage and materials informing boaters and other visitors of appropriate actions to prevent disturbance, limitations on use areas and the boat ramp ... would avoid or mitigate visitor impacts." Additionally, the FEIS provides for ongoing monitoring of marine mammals to "verify [the] effectiveness of mitigation and/or identify needs for any additional management actions."

With respect to migratory birds, the FEIS states:

Several species of migratory birds nest at Fort Baker. Most nest in oak woodlands or the grassland/coastal scrub areas; however, cliff swallows (*Hirundo pyrrhonota*) nest on the buildings at Fort Baker. This species can be seen in the spring building nests, and young are fledged by late summer. All of these birds are protected by the Migratory Bird Treaty Act.

The FEIS also states that brown pelicans and least terns "are often seen in Horseshoe Bay and offshore in the bay." The FEIS states that while they do not have nesting sites at Fort Baker, American peregrine falcons and bald eagles are seen "occasionally flying over the bay." As mitigation, the FEIS provides:

Any removal (including mowing and tree trimming) of landscaped nonnative or native vegetation would follow park guidelines for protection of nesting birds. These guidelines include restrictions on timing of vegetation removal, requirements for searching for active nests prior to removal, and maintaining mowed areas at low height to discourage nesting. Restrictions would also apply to cliff swallow nests on buildings. Bird exclusion measures, such as temporary netting, would also be considered for implementation prior to the start of nesting season. Such actions would be considered on a case-by-case basis by the [Park Service].

The FEIS's discussion of salmonids, including mitigation measures, is described, *infra,* as part of our analysis of the Park Service's compliance with the Endangered Species Act.

█ Although discussion of the effects on specific species is not particularly detailed in the FEIS, we conclude from the description of adverse impacts and, in particular, of the mitigation measures, that the Park Service took a "hard look" at the wildlife impacts, and that the FEIS came to a reasonable conclusion that the Fort Baker Plan would not have a significant impact on these populations. In *Edwardsen v. United States Department of the Interior,* 268 F.3d 781, 790 (9th Cir.2001), we pointed to the inclusion of mitigation within an EIS as an important element in evaluating the reasonableness of the EIS's conclusions on wildlife. *See also Selkirk,* 336 F.3d at 954 (noting that if mitigation measures are "in place, then the reviewing

agencies ought to consider [them] when evaluating the impact of the proposed actions"). Here, the discussion of possible adverse impacts, combined with the mitigation discussion, convinces us that the Park Service took a hard look at the Plan's impacts on wildlife.

5. Methodologies and Sources Used

██ The Guidelines direct agencies to "insure the professional integrity, including scientific integrity, of the discussions and analyses in [an EIS]." 40 C.F.R. § 1502.24. This direction includes a requirement that methodologies and scientific sources be disclosed. *Id.* The FEIS identifies the following methodologies employed in predicting biological impacts:

[1] Completion of a literature review and consultation with experts on vegetation and wildlife at Fort Baker. [2] Identification and mapping of existing plant communities using aerial photography and ground truthing surveys. [3] Identification of wildlife species based on the use of the California Wildlife Habitat Relationship Model and an evaluation of lists of special status species provided by the[United States Fish and Wildlife Service] and the [National Marine Fisheries Service]. [4] Mapping of important natural values within the site or resources which would be potentially affected by the development and use of the site. [5] Field observations regarding special status species identified by the [United States Fish and Wildlife Service] and [National Marine Fisheries Service], bird use of open water in Horseshoe Bay, and marine biological resources in area of impact related to removal of bulkhead.

(Bracketed numbers added.) The FEIS goes on to identify six criteria used to assess the degree of impact. The FEIS states that its analysis of the Plan's impacts on biological resources at Fort Baker relied on two specific sources: "Fort Baker Natural Resources Inventory," prepared in 1998 by EDAW, Inc.; and "Assessment of Baseline Vegetation Conditions and Habitat Restoration Potential at East Fort Baker, Golden Gate National Recreation Area," prepared in 1998 by May Consulting Services. In a similar fashion, the FEIS details the methodologies and specific sources used to assess the Plan's impacts on Fort Baker's cultural resources, traffic and circulation, air quality, land use and community services, and visual and aesthetic resources. The FEIS thus clearly indicates the methodologies and sources used to evaluate the Plan's impacts.

Sausalito nevertheless contends that the FEIS "fails to support its conclusions with scientific evidence." For example, Sausalito contends that the FEIS does not provide support for its conclusions about the Plan's impacts on wildlife in Horseshoe Bay and migratory birds. However, the "Biological Resources" section of the FEIS, in which the impacts of the Plan are discussed, details the methodologies and sources for predicting biological impacts listed above. The FEIS specifically refers to "[f]ield observations regarding special status species identified by [the United States Fish and Wildlife Service] and [the National Marine Fisheries Service], bird use of open water in Horseshoe Bay, and marine biological resources in area of impact related to removal of bulkhead."

Sausalito further contends that the FEIS is inadequate because it fails to make available the biological opinions upon which the FEIS is based. We have held "that NEPA requires that the public receive the underlying environmental data from which [an] ... expert derived her opinion." *Idaho Sporting Congress v. Thomas,* 137 F.3d 1146, 1150 (9th Cir.

1998). This does not mean, however, that an EIS cannot provide such data by incorporating a document by reference, as was done with the biological opinions here. The Guidelines specifically allow for incorporation by reference and instruct agencies to use this method "when the effect will be to cut down on bulk without impeding agency and public review of the action." 40 C.F.R. § 1502.21. Material may not be incorporated by reference when "it is [not] reasonably available for inspection by potentially interested persons" or when it consists of "[m]aterial based on proprietary data which is itself not available for review and comment[.]" *Id.* Sausalito does not contend that the biological opinions at issue were not available for inspection by interested persons or that they consisted of proprietary data not available for review. We therefore conclude that the FEIS adequately reveals the methodologies and scientific sources upon which it relies.

### 6. Failure to Include Cost–Benefit Analysis

 The Guidelines require that "[i]f a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action," the analysis "shall be incorporated by reference or appended to the [EIS] as an aid in evaluating the environmental consequences." 40 C.F.R. § 1502.23. "For purposes of complying with [NEPA]," the Guidelines require that "an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision." *Id.* Sausalito contends that the Park Service used cost-benefit analyses to choose among environmentally different alternatives, but did not comply with the Guidelines' disclosure requirements for such analyses. The Park Service contends

that the documents at issue are not "cost-benefit analyses," but are instead properly understood as "pro formas" that were "prepared and used by the [the Park Service] for [the] very narrow purpose [of testing] the viability of the retreat and conference center from the operator/developer's perspective."

While the Guidelines do not provide a specific definition of "cost-benefit analysis," they make clear that such an analysis may be informal. The Guidelines direct, "For purposes of complying with [NEPA], the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations." *Id.; see also Sierra Club v. Sigler,* 695 F.2d 957, 976 n. 15 (5th Cir.1983). A "cost-benefit" analysis under the Guidelines consists of any analysis identifying and assessing the comparative benefits and/or costs of "environmentally different alternatives." 40 C.F.R. § 1502.23. To be subject to the Guidelines' disclosure requirements, the analysis must be "relevant to the choice" between these alternatives. *Id.* The Guidelines conclude: "In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision." 40 C.F.R. § 1502.23.

We disagree with the Park Service's contention that it did not perform a "cost-benefit analysis." The contested documents consist mostly of reports and letters prepared for the Park Service by the Sedway Group ("Sedway"), a consulting firm specializing in real estate and urban economics. Sedway's July 1997 confidential report entitled "Market and Economic Assessment of Fort Baker Reuse Opportunities" ("1997 Report") explores "the market

and economic viability of a broad range of reuse options at Fort Baker" and concludes that a conference center—rather than an arts, environmental, or recreational center—is the most viable option for the site. Park Service Planner Nancy Hornor was undoubtedly referring to the 1997 Report when she stated in July 1997 that Sedway worked with the Park Service "to develop criteria for selecting reuse options," and that "[b]ased on the data collection, cost estimates and selection criteria, the Sedway Group evaluated a wide range of ideas but narrowed the most economically viable options to three." By the Park Service's own description, the 1997 Report evaluated the comparative benefits—here based on market viability—of environmentally different options and helped to choose among them. Sedway's September 1998 letter ("1998 Letter") served a similar function. Using economic and market indicators, it analyzed and "summarized the potential economic impacts of the proposed Conference and Retreat Center at Fort Baker, in addition to the anchor uses of the other three alternatives detailed in the Fort Baker EIS."

Although neither the 1997 Report nor the 1998 Letter was formally incorporated into the FEIS, the considerations and evaluative criteria used in the Report and the Letter were adequately revealed in the FEIS. The Report comparatively assessed the discussed alternatives for their "capacity to generate funds for the [Park Service's] infrastructure and site improvements." As Sausalito itself has made clear, the criterion of generating funds is considered throughout the FEIS. The 1998 Letter discussed alternatives that were comparatively assessed for their capacity to generate jobs, visitor spending, and regional hotel demand. These criteria are discussed in the FEIS's section on "Land Use and Community Services." We therefore hold that the FEIS's failure formally to incorporate or append these analyses does not violate NEPA.

■ The other documents identified by Sausalito do not assess the comparative merits of environmentally different options. Rather, they explore the feasibility of only one element of the proposed action-the conference center itself. These documents are thus not cost-benefit analyses subject to the Guidelines' disclosure requirements, but are, as the Park Service described them, "pro formas" intended to help the Park Service understand in further detail the viability and parameters of a single option.

### C. Endangered Species Act

The Endangered Species Act ("ESA") prohibits "taking" an endangered or threatened species, 16 U.S.C. § 1538(a)(1)(B), and requires the Secretary of the Interior to

> insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined ... to be critical, unless such agency has been granted an exemption....

*Id.* § 1536(a)(2). The ESA requires a consultation process among agencies. First, a federal agency proposing action that may result in a "taking" must ask the appropriate federal service-either the United States Fish and Wildlife Service ("Fish and Wildlife Service") or the National Marine Fisheries Service ("Fisheries Service")—whether a listed or proposed endangered or threatened species may be present in the area of the proposed action. *Id.* § 1536(c)(1).

■ If the relevant service answers that such a species may be in the area, the

agency proposing action must then conduct a "biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.* The assessment need not take any specific form, and the ESA specifically authorizes that "such assessment may be undertaken as part of a Federal agency's compliance with the requirements of [conducting an EIS under NEPA]." *Id.* The ESA's implementing regulations provide that the contents of the biological assessment can include, in the agency's discretion, the results of on-site inspection, the views of experts, proposed alternate action, literature reviews, an analysis of the effects on the species, and incorporation of other assessments by reference. 50 C.F.R. § 402.12(f)(1)-(5). What is required is that a biological assessment "evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a). We will find a biological assessment inadequate only if the agency "entirely failed to consider an important aspect of the problem or to consider the relevant factors and articulate a rational connection between the facts found and the choice made." *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 901 (9th Cir.2002) (internal quotations and citation omitted) (brackets omitted).

If the agency proposing action determines, on the basis of the biological assessment, that its action "may affect" an endangered species, the agency must initiate the process of "formal consultation" with the appropriate service. 50 C.F.R. § 402.14(a). In this process, the agency must provide the service with "the best scientific and commercial data available or which can be obtained during the consultation." *Id.* § 402.14(d). Formal consultation results in a "biological opinion" in which the service

> shall provide to the Federal agency ... a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes ... can be taken by the Federal agency....

16 U.S.C. § 1536(b)(3)(A). The suggested alternatives "may not jeopardize the listed species or result in the destruction or adverse modification of its critical habitat." *Am. Rivers v. Nat'l Marine Fisheries,* 126 F.3d 1118, 1122 (9th Cir.1997).

In formulating the Fort Baker Plan, the Park Service consulted with both the Fish and Wildlife Service and the Fisheries Service. After receiving lists of species and habitats that may potentially be affected by the Fort Baker Plan, the Park Service prepared a biological assessment of impacts to the listed species, which it included in the October 1998 draft EIS. The Fisheries Service informed the Park Service in October 1998 that it would concur in the Park Service's determination that the Fort Baker Plan would not likely affect the listed species if the Park Service included certain mitigation measures in its proposed action. These mitigation measures were then incorporated into the FEIS. The Park Service concluded in its biological assessment that the Mission Blue Butterfly was the only species likely to be affected by the Plan, and requested formal consultation with the Fish and Wildlife Service on the Butterfly. Consultation ended in September 1999 when the Fish and Wildlife Service issued a biological opinion concluding that the Fort Baker Plan, including its mitigation measures, "is

not likely to jeopardize the continued. existence of the mission blue butterfly."

Sausalito contends that an adequate biological assessment was not prepared with respect to the Fort Baker Plan's effects on the Mission Blue Butterfly and the salmonids listed in the FEIS. Sausalito also contends that the Park Service did not comply with the 180–day deadline for preparing a biological assessment.

### 1. Mission Blue Butterfly

The Mission Blue Butterfly ("Butterfly") is classified as an endangered species, and Fort Baker is one of its only remaining habitats. In 1995, a biological opinion ("1995 Opinion") was prepared for the Golden Gate Bridge District as part of a seismic and wind retrofit of the Golden Gate Bridge. The north end of the Bridge abuts Fort Baker. The 1995 Opinion concluded that the Bridge retrofit was not likely to jeopardize the Butterfly's continued existence, provided that restoration and preservation of Butterfly habitat in Fort Baker was undertaken as mitigation. The 1995 Opinion specified that any proposed change to its designated Butterfly habitat restoration sites at Fort Baker should be approved by the Fish and Wildlife Service.

Sausalito contends that the Park Service failed to consider information contained in the 1995 Opinion in its biological assessment in connection with the Fort Baker Plan, and that the Fish and Wildlife Service failed to incorporate such information into its biological opinion. It further contends that neither the Park Service nor the Fish and Wildlife Service properly disclosed or considered an asserted conflict between the Fort Baker Plan and Butterfly habitat restoration required by the 1995 Opinion. We disagree with both contentions.

The FEIS clearly acknowledges the mitigation requirements contained in the 1995 Opinion. It states that "[p]lanned restoration of [Butterfly] habitat as mitigation for the Golden Gate Bridge seismic retrofit work would continue to be implemented at Fort Baker," and that the Park Service "conducts annual surveys for the butterfly, and both the [Park Service] and the [Bridge District] have been actively improving habitat at Fort Baker primarily through removal of invasive plants." The FEIS provides the following mitigation for Butterfly habitat:

Future restoration efforts [for Butterfly habitat] identified as part of the Proposed Action would expand on [the restoration undertaken pursuant to the 1995 Opinion], completing up to 23 acres of additional butterfly habitat restoration onsite. The [Park Service] would develop assurances that the [Butterfly] habitat restoration, enhancement, and maintenance takes place in a timely manner as proposed by ensuring that funding would be available for these efforts. The [Park Service] would provide a description of these assurances to the [Fish and Wildlife Service] for review and approval before November 1, 1999, consistent with the terms and conditions of the[Fish and Wildlife Service's] Biological Opinion for the project (signed September 29, 1999).

\* \* \*

Before January 1, 2005, the [Park Service] would review with the [the Fish and Wildlife Service] the status of Fort Baker Plan, the [Butterfly], and the success of the plan in minimizing impacts to the species. As a result of this review, [Fish and Wildlife Service] will consider the extension or reinitiation of the biological opinion.

Among other things, the FEIS provides for further mitigation through a "protocol

for monitoring visitor-associated impacts to the [Butterfly], its host plants and habitats." The FEIS also provides for protections to the Butterfly during construction that include the presence of a "qualified biologist [who] would monitor construction activities ... and stop work if necessary to protect" the Butterfly. Finally, the FEIS provides for anti-poacher training and enforcement with respect to the Butterfly, the control of invasive non-native plants that threaten Butterfly habitat, and the restoration of Butterfly habitat in areas currently populated with non-native trees.

Sausalito points to an internal memo, contained in the administrative record and written by a Park Service employee before release of the draft EIS, expressing concern that habitat restoration sites associated with the Bridge District's mitigation activities would potentially conflict with elements of the Fort Baker Plan "that will likely be recommended by the [Plan] for uses other than habitat restoration." The record reflects, however, that the Park Service ultimately concluded that there would not be such a conflict. The "Assessment of Baseline Vegetation Conditions and Habitat Restoration Potential at East Fort Baker," which is included by reference in the FEIS and is a part of the Fish and Wildlife Service's consultation record, states:

> Planned recreational improvement (e.g., development of visitor facilities, enlargement of the Discovery Museum, development of additional parking areas and trails) are located *adjacent to* areas known to support Mission blue butterfly, a federally listed endangered species. *Although direct loss of habitat is not anticipated to result from construction of recreational facilities,* project implementation is likely to result in secondary construction effects (e.g., dust, erosion) on surrounding plant communities, in-

cluding communities that support host plants for the Mission blue butterfly. (Emphasis added.)

On this record, we conclude that the Park Service and the Fish and Wildlife Service considered all the "relevant factors" and "important aspect[s] of the problem" with respect to the Butterfly. *Native Ecosystems Council,* 304 F.3d at 901. The need for restoration and preservation of Butterfly habitat both in general and in reference to the obligations of the Bridge District was adequately considered in assessing the effects of the Fort Baker Plan on the Butterfly. Further, Sausalito's assertion of a conflict between the Fort Baker Plan and the Bridge District's requirements is not borne out by the record. When "a court reviews an agency action involving primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Sierra Club,* 346 F.3d at 961 (citation and internal quotations and brackets omitted); *see also Ariz. Cattle,* 273 F.3d at 1236 ("We are deferential to the agency's expertise in situations, like that here, where resolution of this dispute involves primarily issues of fact.") (internal quotations and citation omitted). It is clear that both the Park Service and the Fish and Wildlife Service used their "informed discretion" in concluding that the Fort Baker Plan will not encroach on Butterfly habitat or jeopardize the continued existence of the Butterfly. We defer to that informed discretion. *Sierra Club,* 346 F.3d at 961.

### 2. Salmonids

Sausalito contends that the FEIS's discussion of salmonids is inadequate to serve as a biological assessment under the ESA. The FEIS states that among the "sensitive and special status

species known to or likely to occur at Fort Baker are ... chinook salmon, coho salmon (*Oncorhynchus kisutch*), and steelhead (*Oncorhynchus mykiss*)." The FEIS states that the Fisheries Service "has indicated that Horseshoe Bay is located within the designated critical habitat for the winter run of the Sacramento River winter-run chinook salmon (*Oncorhynchus tschawystcha*)." Further, the FEIS states that the Fisheries Service and the Fish and Wildlife Service "identified species that are federally listed as endangered or threatened or federal candidates with distributions that occur ... where Fort Baker is located.... The habitat and possible occurrence of these species and other sensitive species is considered in Appendix C." Appendix C lists these salmonids' specific classification, habitat, known distribution, occurrence, and critical habitat at Fort Baker. For some of the salmonids, the table identifies the time of year when they are present at Fort Baker.

The FEIS also provides specific mitigation measures to prevent harm to salmonids in the area. Specifically, the FEIS states:

To minimize impacts to listed and proposed-for-listing species, as well as herring spawning habitat, bulkhead/riprap removal, beach restoration, marina conversion, and future dredging activities (if deemed necessary) shall occur during the months of June through September and would therefore be scheduled outside the normal herring spawning period (October through April). *These activities would also be conducted outside the period of the downstream migration of juvenile salmon, which begins in the northern portions of the Sacramento River system in July through December, with peak migration in September and October.* This migration can continue until mid-March in drier years.... Consultation with resource and permit-

ting agencies through the Corps permit process could identify additional requirements to protect aquatic organisms.... [T]his would avoid or mitigate short-term adverse impacts to aquatic organisms and fish as a result of beach restoration and dredging activities.

(Emphasis added.)

Sausalito argues that the listing of threatened salmon species in the appendix, rather than in the text of the FEIS, impairs its usefulness as a biological assessment. We disagree. There is no requirement barring a biological assessment from including relevant information in an appendix, and the text of the FEIS clearly indicates that further information about specific species is included in Appendix C. Sausalito also argues that the FEIS is not adequate as a biological assessment because it does not "address the summer presence of some of these salmon stock within Horseshoe Cove, and their vulnerability to harm from the Plan's proposed construction, excavation and dredging activities." We disagree with this argument as well. The presence of particular species of juvenile salmon in the area was set out in Appendix C, and the presence of salmon generally was discussed in the mitigation section. That section describes the timing of the salmon migration, stating: "[T]he period of the downstream migration of juvenile salmon ... begins in the northern portions of the Sacramento River system in July through December, with peak migration in September and October." The Park Service thus discussed the potential presence of salmon in the area and tailored a mitigation measure that would respond to the salmon's presence. Because we are convinced that the Park Service considered all the "relevant factors" and "important aspect[s] of the problem" and crafted an assessment, requiring specific mitigation, that was responsive to

these concerns, *Native Ecosystems Council*, 304 F.3d at 901, we hold that the Park Service's biological assessment was adequate under the ESA.

### 3. Compliance with 180–Day Deadline

The ESA requires, with some exceptions, that a biological assessment be completed within 180 days. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i). Sausalito claims that the Park Service violated the ESA by not completing a biological assessment within 180 days after receiving a species list from the Fish and Wildlife Service. On May 6, 1998, the Fish and Wildlife Service provided the Park Service with a list of species and habitats that may be affected by the Plan. The Park Service issued a biological assessment in the form of the draft EIS on October 14, 1998, within 180 days of receipt of that list. Soon after, on October 19, 1998, responding to a July 1998 request from the Park Service, the Fish and Wildlife Service sent the Park Service an updated species list that included species not on the previous list. The Park Service issued its FEIS and updated biological assessment in October 1999, almost a year after receiving the updated and expanded list.

The Park Service concedes that the October 1999 biological assessment violated the 180–day deadline. The Park Service argues, however, that "Sausalito cannot show that this violation harmed or will harm any of its interests." In reviewing agency action, the APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. We have applied a harmless error rule to agency action differently, depending on both the types of action and error at issue. In the rulemaking context, we "exercise great caution in applying the harmless error rule," holding that "failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir.1992) (internal quotations and citations omitted); *accord Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.1995); *Cal–Almond, Inc. v. USDA*, 14 F.3d 429, 442 (9th Cir.1993); *Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir. 1982). In other contexts, however, our review for harmless error is more demanding of plaintiffs. Where the agency's error consisted of a failure to comply with regulations in a timely fashion, we have required plaintiffs to identify the prejudice they have suffered. Thus, when plaintiffs have "failed to identify any prejudice from the delay, no [judicial] action is warranted." *Hall v. U.S. EPA*, 273 F.3d 1146, 1163–64 (9th Cir.2001); *see also Kolek v. Engen*, 869 F.2d 1281, 1286 (9th Cir.1989) (discussing application of harmless error rule to procedural mistakes).

In this case, like *Hall*, the agency's error consisted of tardiness in performing a required task. By the time suit was filed, however, the task had been completed. In this circumstance, we require plaintiffs to identify the harm they have suffered because of the agency delay. Because Sausalito, like the plaintiff in *Hall*, has pointed to no harm resulting from the Park Service's belated biological assessment, we hold that it is not entitled to a remedy as a result of the Park Service's tardiness.

Our holding is consistent with our decisions in *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166 (9th Cir.2002), and *Center for Biological Diversity v. Norton*, 254 F.3d 833 (9th Cir.2001), where, without conducting a harmless error review, we awarded the remedies plaintiffs sought when an agency had not complied with ESA deadlines. In both *Badgley* and *Norton*, plaintiffs sought injunctions to compel

agencies to perform actions required by the ESA. In both cases, the agency had not yet performed its obligations under the ESA when suit was filed, and plaintiffs sought to compel performance of those obligations. Here, by contrast, when Sausalito filed suit, the Park Service had already satisfied its ESA obligations in that it had issued—albeit belatedly—a biological assessment in the form of the FEIS. Because we conclude that the Park Service's tardiness was harmless, Sausalito is not entitled to an injunction, based on the ESA, preventing the Park Service from implementing the Fort Baker Plan.

### D. Coastal Zone Management Act

The Coastal Zone Management Act ("CZMA") requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A). A federal agency ensures consistency of its actions with a state management program by submitting a "consistency determination to the relevant State agency." *Id.* § 1456(c)(1)(C); *see also* 15 C.F.R. § 930.36. After receipt of the consistency determination, the "State agency shall inform the Federal agency of its concurrence with or objection to the Federal agency's consistency determination." 15 C.F.R. § 930.41.

California has an approved coastal management program for the San Francisco Bay ("the Bay"). Cal. Govt.Code §§ 66600, 66603. The San Francisco Bay Conservation and Development Commission ("Bay Commission") administers the program under the San Francisco Bay Plan ("Bay Plan"). *Id.* §§ 66603, 66620–25. The Bay Plan directs, in relevant part,

that "[l]imited commercial recreation facilities, such as small restaurants, should be permitted within waterfront parks provided they are clearly incidental to park use, are in keeping with the basic character of the park, and do not obstruct public access to and enjoyment of the Bay." The Bay Plan further directs that "[l]imited commercial development may be appropriate ... in all parks shown on the Plan maps *except where there is a specific note to the contrary*" (Emphasis added.) Such a "specific note to the contrary" appears on "Bay Plan Map No. 4," and states that "[n]o commercial uses [should occur at Fort Baker] except for convenience needs of park visitors."

The Park Service submitted to the Bay Commission a "consistency determination" that the Fort Baker Plan was consistent with the Bay Plan. The Bay Commission concurred in this determination. Sausalito contends that this consistency determination does not satisfy the CZMA because the Fort Baker Plan is not "consistent to the maximum extent practicable" with the Bay Plan. 16 U.S.C. § 1456(c)(1)(A). Sausalito argues that the Bay Plan clearly indicates that "commercial uses" are permitted at Fort Baker only if they are "for [the] convenience needs of park visitors," and that "commercial recreation facilities" are "permitted within waterfront parks" only if "they are clearly incidental to park use." Sausalito argues that the construction of a conference center at Fort Baker contravenes these clear directives because the conference center and its attendant commercial services will be "destination magnets designed to draw hundreds of thousands of visitors to Fort Baker for conventions, seminars and other purposes unrelated to recreational enjoyment of[Fort Baker's] waterfront." Sausalito also argues that, in contravention of the Bay Plan, the conference center is not "in keeping with the basic character of the

park." Because of these asserted inconsistencies, Sausalito contends that the Park Service's determination that the Fort Baker Plan is consistent with the Bay Plan is incorrect.

■ In considering challenges to CZMA consistency determinations, we have previously stated that "[w]here procedures to resolve potential federal-state disagreements over matters affecting the jurisdiction of both have been established, we should be reluctant to set aside determinations made pursuant to those procedures absent a compelling reason to do so." *Save Lake Washington v. Frank,* 641 F.2d 1330, 1339 (9th Cir.1981). We do not generally find a "compelling reason" to overturn a consistency determination simply because our "opinion on the substantive issue of consistency" is different from that of the federal and state agencies. *Cf. id.* ("express[ing] no opinion on the substantive issue of consistency" and refusing to overturn federal consistency determination). That is, we will not generally overturn a consistency determination just because we might have come to a different conclusion were the determination of "consistency" before us in the first instance. *Cf. Overton Park,* 401 U.S. at 416, 91 S.Ct. 814 (1971) (we may not substitute our judgment for that of agency when reviewing agency action).

■ However, in this case, we hold that there is a "compelling reason" to hold that the Park Service's consistency determination was based on an improper ground under the CZMA. *Save Lake Washington,* 641 F.2d at 1339. The regulations implementing the CZMA specifically provide that "[f]ederal agencies shall not use a general claim of a lack of funding . . . as a basis for being consistent to the maximum extent practicable with an enforceable policy of a management program." 15 C.F.R. § 930.32(a)(3). In arriving at its

consistency determination, and in procuring the Bay Commission's concurrence in that determination, the Park Service relied on just such a "general claim" of insufficient funding.

In presenting its consistency determination to the Bay Commission, the Park Service stated, "As the steward of more than 670 historic structures, the Golden Gate National Recreation Area has a 27–year track record of historic preservation through compatible re-use. . . . *This is important because the initial high cost of rehabilitation of the historic buildings can not be met entirely through federal appropriations* . . . ." (Emphasis added.) The Park Service continued, "The Fort Baker Plan proposes to continue in that tradition by engaging partner organizations to provide for visitor-oriented public uses . . . includ[ing] the Bay Area Discovery Museum and a public-serving retreat and conference center."

The Bay Commission relied heavily on the Park Service's claim of insufficient funding in ultimately concurring with the Park Service's consistency determination. The Bay Commission noted that the conference center proposed for Fort Baker seemed to conflict with the Bay Plan's limitations on commercial uses. The Bay Commission stated:

> According to Bay Plan Map No. 4 . . . the center, if commercial, should not be located at Fort Baker, except for visitors' convenience. Nevertheless, new uses would be required to rehabilitate and preserve the historic buildings.
>
> However, in this case, the [Park Service] believes the funds that will be obtained from the conference and retreat center are necessary to save the historic structure and provide for their use and enjoyment. In addition, the [Park Service] believes that the conference and retreat center is a public use, imple-

mented through a partnership that may involve a commercial partner. The [Park Service] noted that "... [a] comprehensive assessment of the buildings and infrastructure revealed that funding is needed to ... renovate buildings for their new uses. A major investment of resources is needed to address the historic preservation and public use goals for this historic landmark-an amount that significantly exceeds the level of· funding available through federal sources."

The center is intended to provide the additional funds needed to preserve the site, but the [Park Service] also believes that an identity for the center can be created that will strengthen its relationship to Fort Baker through the creation [of] conference and retreat center programming that serves the public.

\* \* \*

Thus, the [Park Service] believes that the proposed reuse of Fort Baker, including the conference and retreat center, is consistent with the Bay Plan recreation policies to the maximum extent practicable. *The funding required to rehabilitate and maintain the important historic structures and to support the park-related programs will be provided by the conference center; therefore, the center will help to create a unique shoreside park at Fort Baker.*

(Emphasis added.) The Bay Commission then concluded that the Fort Baker Plan was consistent with the Bay Plan "to the maximum extent practicable":

*The Commission finds that the Fort Baker Reuse Plan is consistent to the maximum extent practicable with the Bay Plan policies on recreation because the rehabilitation and maintenance of the historic structures present at Fort Baker must be funded·* and the conference and retreat center will be operated in a manner compatible with an enlivening to the core park space, even if the conference and retreat center were found to be a commercial use that is not fully consistent with the Bay Plan Map policy note. In fact, a revenue-generating source is required to accomplish the recreational and shoreside park goals identified in the Bay Plan policies.

(Emphasis added.)

▮ In making its consistency determination and in seeking the Bay Commission's concurrence, the Park Service relied on the need to generate funds for the Fort Baker complex, even though lack of funds is explicitly forbidden as a criterion for finding consistency under 15 C.F.R. § 930.32(a)(3). The Park Service's and the Bay Commission's reliance on a proscribed criterion in concluding that the Fort Baker Plan is "consistent to the maximum extent possible" with the Bay Plan is a "compelling reason" for holding that the Park Service's consistency determination was improper under the CZMA. Because the Park Service "relied on factors which Congress has not intended [them] to consider," we hold that the Park Service acted arbitrarily and capriciously with respect to its statutory obligations under the CZMA. *Motor Vehicle Mfrs.,* 463 U.S. at 43, 103 S.Ct. 2856.[2]

---

**2.** The Park Service has sought to supplement the record on appeal to this court. According to the Park Service, the Bay Commission adopted an amendment to the Bay Plan on October 17, 2002, but the United States Department of Commerce has not yet approved it. The amendment would change the parts of the Bay Plan that have restricted commercial development at Fort Baker. If approved, a newly added section, "Policy 5c: Bayfront Military Installations Designated as Waterfront Parks," .would provide:

To assist in generating the revenue needed to preserve historic structures and develop

### E. Marine Mammal Protection Act

It is unlawful under the Marine Mammal Protection Act ("MMPA") to "take" a marine mammal without a permit. 16 U.S.C. §§ 1372, 1374. Under the statute, "take" means "harass, hunt, capture, or kill" or to attempt to "harass, hunt, capture, or kill." *Id.* § 1362(13). A 1994 amendment to the MMPA defines "harassment" as

any act of pursuit, torment, or annoyance which—

(i) has the potential to injure a marine mammal or marine mammal stock in the wild; or

(ii) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

*Id.* § 1362(18)(A). This definition or harassment is broader than it had been prior to the amendment. Implementing regulations to the MMPA, promulgated before the passage of the 1994 amendment and not subsequently amended, define "take" as follows:

Take means to harass, hunt, capture, collect, or kill, or attempt to harass, hunt, capture, collect, or kill any marine mammal. This includes, without limitation, any of the following: The collection of dead animals, or parts thereof; the restraint or detention of a marine mammal, no matter how temporary; tagging a marine mammal; the negligent or intentional operation of an aircraft or vessel, or the doing of any other negligent or intentional act which results in disturbing or molesting a marine mammal; and feeding or attempting to feed a marine mammal in the wild.

50 C.F.R. § 216.3.

Sausalito contends that implementation of the Fort Baker Plan will effectuate a "taking" without an MMPA permit. The FEIS states, "Construction activities at the fishing pier and marina could temporarily disrupt all marine animals, including harbor seals, California sea lions, and feeding, resting and nesting waterbirds and seabirds, in the proximity of work sites and in the water." It further states that "[i]ncreased boating in the area and use of the boat ramp might disrupt marine mam-

and maintain park improvement and to achieve other important public objectives, uses other than water-oriented recreation, commercial recreation and public assembly facilities may be authorized on former military installations designated on the Bay Plan maps for waterfront park uses only at locations identified in the Bay Plan map policies.

Further, the Bay Plan map for the area that includes Fort Baker would be amended to eliminate the notation that has previously provided, *"No commercial except for convenience needs of park visitors."*

We may take judicial notice of a record of a state agency not subject to reasonable dispute. *See Mack v. S. Bay Beer Distribs., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986) (court may take judicial notice of records and reports of state administrative bodies), *overruled on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166,

115 L.Ed.2d 96 (1991). We decline, however, to do so here. Even if we were to take judicial notice of the amended Bay Plan, and even if the amended plan has legal consequence in the absence of approval by the Department of Commerce, the amended Bay Plan would not affect the appeal now before us. The federal courts are not empowered to determine, in the first instance, whether the Fort Baker Plan, as described in the FEIS, is consistent with the Bay Plan. Rather, the federal courts are required under the CZMA to review agency assessments of consistency of the Fort Baker Plan with the Bay Plan. Until there has been an agency consistency determination, there is nothing for the federal courts to review. We decline to take judicial notice of the amendments to the Bay Plan that have been adopted by the Bay Commission because, even if we took judicial notice, the amendments could have no legal significance in this appeal.

mals ... that congregate in the area." Relying in part on our decision in *United States v. Hayashi*, 22 F.3d 859 (9th Cir. 1993), the Park Service contends that implementation of the Plan will not effectuate a taking. However, we decided *Hayashi* a year before the adoption of the 1994 amendment expanding the definition of "harassment."

Because the district court held that Sausalito did not have standing to seek an injunction requiring that the Park Service seek a permit, it did not reach the merits of Sausalito's claim under MMPA. The briefing on the merits in this court is somewhat cursory. Under the circumstances, we think it best for us not to decide the question as an initial matter. We are remanding the case to the district court in any event because of our holding on Sausalito's claim under the Coastal Zone Management Act, and we therefore do not unduly delay final resolution of this case in remanding to the district court for an initial decision on the merits of Sausalito's MMPA claim.

### F. Migratory Bird Treaty Act

The Migratory Bird Treaty Act ("MBTA") provides that without authorization from the Secretary of the Interior it is unlawful to "pursue, hunt, take, capture, kill, attempt to take, capture, or kill" any migratory bird or "any part, nest, or egg of any such bird...." 16 U.S.C. § 703. Sausalito asserts that implementation of the Fort Baker Plan will violate the MBTA because migratory birds' nesting trees will be cut down, thereby disturbing both birds and their nests. The FEIS makes clear that the Park Service has not sought, and does not intend to seek, authorization from the Secretary.

In *Seattle Audubon Society v. Evans*, we explained that the definition of an unlawful "taking" under the MBTA "de-scribes physical conduct of the sort engaged in by hunters and poachers, conduct which was undoubtedly a concern at the time of the statute's enactment in 1918." 952 F.2d at 302. There we held that unlike under the ESA, an unlawful "taking" under the MBTA did not occur through "habitat destruction," even that which "le[d] indirectly to bird deaths." *Id.* at 303. Because Sausalito alleges only that migratory birds and their nests will be disturbed through habitat modification, we hold that the Park Service does not need to seek authorization from the Secretary.

### G. National Park Service's Organic Act & the Act Establishing the Golden Gate National Recreation Area

The National Park Service's Organic Act ("Organic Act") provides:

The authorization of activities shall be construed and the protection, management, and administration of these areas shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as may have been or shall be directly and specifically provided by Congress.

16 U.S.C. § 1a–1. The Act establishing the Golden Gate National Recreation Area instructs that the Secretary of the Interior "shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management," and further that the Secretary "shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." *Id.* § 460bb.

Sausalito contends that the Park Service violated these Acts in two ways. First, it contends that the Park Service "disregarded and contravened this 'purpose' by approving the Plan without adequate environmental review and consideration of alternatives." Second, it contends that the Park Service has circumvented its "fundamental purpose" of "resource protection" and its mandate to protect the Golden Gate National Recreation Area "from development and uses which would destroy the scenic beauty and natural character of the area" by opening Fort Baker to a "huge increase in the existing intensity of development" that "would transform Fort Baker into an urban center of over 400,000 square feet of commercial uses, including 156,000 square feet of new development...."

 We disagree. Because we have held that the Park Service complied with NEPA and the ESA, we reject Sausalito's claim to the extent that it is premised upon violation of these statutes. We also reject Sausalito's claim that the development contemplated for Fort Baker is fundamentally at odds with the congressional directives of the Organic Act and the Act establishing the Golden Gate National Recreation Area. As an initial matter, the Fort Baker Plan will not, as Sausalito asserts, add 156,000 square feet of new development to the site. As the FEIS indicates, this figure is offset by the projected removal of 71,000 square feet of existing structures. The maximum net new construction is therefore only 85,000 square feet. Further, the FEIS states that "[t]he proposed rehabilitation, demolition and new construction would be accommodated within the existing developed footprint of Fort Baker and be required to maintain the site's character.... No adverse land use impacts due to building removal or new construction are expected." In describing how the Fort Baker Plan would preserve the character of the site, the FEIS states:

Increased activity levels, especially in the conference and retreat center and the waterfront, including the [Bay Area Discovery Museum] complex could change the feeling of Fort Baker as an undiscovered site. However, the Proposed Action would provide for maximum protection of the site's cultural and natural resources to protect the intangible qualities that contribute to its special character. Many of its deteriorated landscape features would be enhanced or restored. In general, landscape and buildings changes would be in keeping with the historic character of the site. Intensive uses would remain in areas where they currently occur (waterfront, [Bay Area Discovery Museum] and Parade Ground/ Capehart areas) or would take place indoors (conference and retreat center). Guidelines would control compatibility of events held at Fort Baker. Preservation of the character of Fort Baker is considered a beneficial impact.

The FEIS further details that "[a]pproximately 42 acres of natural habitat would be maintained, enhanced or restored" and "[e]xisting trails would be improved where surfaces are degraded, signing inadequate, or where accessibility improvements are possible without conflicting with other resource values." With respect to the site's scenic beauty, the FEIS states that "the Proposed Action includes the removal of visually distractive elements, such as deteriorated surfaces, nonhistoric structure, and asphalt paving. These site changes, as well as the creation of the beach and the restoration of the Parade Ground, would substantially enhance existing views by improving the park—and campus-like character and revealing the historic nature of the site." Finally, with respect to the cumulative impacts to the visual and aesthetic resources of the site, the FEIS concludes:

Fort Baker and the adjacent Marin Headlands provide a striking and rugged backdrop against the highly urbanized San Francisco peninsula and surrounding Bay Area. The visual prominence and importance of this area to the regional landscape is substantial. Implementation of the Proposed Action would provide for the long-term protection and enhancement of Fort Baker's character by preserving and restoring historic buildings and the cultural landscape. Removal of existing parking at the waterfront, and restoration of this area to beach and grassy area would improve views from the Parade Ground towards the Bay as well as views from off-site. Ongoing resource management actions such as habitat restoration projects and other site stewardship programs within the Headlands and in other visually prominent areas ... would have a positive effect on scenic vistas and views within the region.

On this record, we cannot conclude that the development contemplated by the Fort Baker Plan is fundamentally at odds with the directives of the Organic Act and the Act establishing the Golden Gate National Recreation Area. We are satisfied that the Park Service has balanced the potential harms of development with its responsibilities for conservation, preservation, and public service. In the absence of a particular congressional directive outlining specific limitations on the development of Fort Baker-such as that provided for the Presidio of San Francisco, another Golden Gate National Recreation Area site-we decline to hold that the Park Service arbitrarily and capriciously violated these Acts. *See* Omnibus Parks and Land Management Act of 1996, Pub.L. No. 104–333, § 104(c)(3), 110 Stat. 4093, 4102 (1996) (management program for the Presidio shall provide that "new construction [is] limited to replacement of existing structures of similar size in existing areas of development").

### H. Concessions Management Improvement Act

■ The Regulations implementing the Concessions Management Improvement Act ("CMIA") direct that "[d]evelopment of visitor services in park areas will be limited to locations that are consistent to the highest practicable degree with the preservation and conservation of the resources and values of the park area." 36 C.F.R. § 51.2. Sausalito contends that the Park Service has violated this Regulation by not developing the "maximum resource restoration" alternative in the FEIS, and by "ignor[ing] procedures required under NEPA, ESA, CZMA, MMPA, and MBTA, further eroding the park's natural resources."

To the extent that Sausalito's claim is based on the Park Service's dismissal of the "maximum resource restoration" alternative, we reject it. We have already concluded that it was not arbitrary and capricious for the Park Service not to have developed this alternative further. To the extent that Sausalito's claim is based on its contention that the Park Service did not satisfy its statutory obligations under the listed statutes, we also reject it. We have already concluded that, with the exception of the CZMA, the Park Service complied with its statutory obligations. That the Park Service has failed, however, to comply with the CZMA does not demonstrate that it has developed visitor services in "locations that are [not] consistent to the highest practicable degree with the preservation and conservation of the resources and values of the park area" within the meaning of the CMIA. *Id.* On this record, we cannot conclude that the Park Service has arbitrarily and capriciously failed to satisfy its obligations under the CMIA.

## I. Omnibus Parks and Public Lands Management Act of 1996

■ The Omnibus Parks and Public Lands Management Act of 1996 ("Omnibus Act") directs that "[t]he Secretary may not utilize any lands for the purposes of providing field employee housing ... which will impact primary resource values of the area or adversely affect the mission of the agency." 16 U.S.C. § 17o(17)(A). Sausalito contends that the Fort Baker Plan violates this prohibition by authorizing on-site housing that "impacts Fort Baker's 'primary resource values' ... by impairing Fort Baker's 'scenic beauty and natural character,'" citing the Act creating the Golden Gate National Recreation Area, 16 U.S.C. § 460bb. As discussed above, the FEIS emphasizes that the Fort Baker Plan will preserve and enhance Fort Baker's "scenic beauty and natural character." Sausalito has pointed to nothing contravening the FEIS in this respect. We therefore hold that the Park Service did not act arbitrarily or capriciously with respect to its obligations under the Omnibus Act.

## Conclusion

We hold that Sausalito has standing to pursue all of its claims under all the statutes under which it brought suit. With the exception, however, of its claims under the Coastal Zone Management Act and the Marine Mammal Protection Act, Sausalito's claims fail on the merits. We remand to the district court for further proceedings consistent with this opinion. Parties shall bear their own costs.

AFFIRMED in part; REVERSED in part; and REMANDED.